UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
BRYSON CITY DIVISION
CASE NO. 2:11-CV-42

VIDA CODY,                                    )
                                              )
             Plaintiff,                       )
      v.                                      )
                                              )
SWAIN COUNTY, NORTH                           )
CAROLINA, KEVIN KING, in his                  )
official and individual capacity,             )
PHILLIP CARSON, in his official and           )
individual capacity, ROBERT WHITE,            )
in his official and individual capacity,      )
DAVID MONTEITH, in his official               )
and individual capacity, STEVE                )
MOON, in his official and individual          )
capacity, and DONNIE DIXON, in his            )
official and individual capacity,             )

_____ Defendants. _____

Attachment 1 to Exhibit A: Excerpts of Vida Cody's deposition and exhibits, taken

on September 12 and 13th, 2012 (Deposition excerpts after page 300 and exhibits)

else?

A     It would be Mr. Bowman.

Q     Okay.  The second page of that, 2010-3, the condition or problem appears to be that the sheriff's office didn't allow you to control funds from fund-raising events; is that --

A     Not exactly.

Q     No?

A     They were having fund-raisers, and nobody knew anything about it.  And Kevin was very upset about it because there was no control over that money, and there had to be a control over it.  And we had talked about it.  Kevin said, call the auditor.  See what we can do.

I called Eric and talked to him, and he said -- his recommendation even over the phone, actually that was before this, was to tell them that that money had to be controlled.

Q     Okay.  By someone?

A     By someone.

Q     Okay.

A     And I couldn't do anything.  The only thing that I could do was to go help them.  You know, go say, I'll help you.  I'll handle your

to.

Q    Okay.

A    To do nothing means you have the ability to do something and do not.  To not be able to, you can't do it.

Q    And perhaps I should -- did you do anything to implement --

A    I could not do anything.

Q    Okay.  Next page, I'm going to skip.  The last three pages, 269 through 271, it says, Corrective Action Plan for Swain County.  Who prepared these three pages, if you know?

A    I believe Eric Bowman.

Q    And the name of the contact person, at least on page 269, is you; right?

A    Yes, it is.

Q    And these findings, 2010-1, 2010-2, 2010-3, all correlate back to the findings contained on 266 and 267; is that correct?

A    It looks so.

Q    And so you're the contact person for finding number one of 2010; right?

A    That's what he has listed.

Q    Okay.  And that's a document he prepared; right?

September 13, 2012

12:15 p.m.

(Whereupon the reporter provided a written disclosure to all counsel pursuant to OCGA 9-11-28.)

THE VIDEOGRAPHER: We're on the record, starting disk number five.

VIDA CODY,

being previously sworn, was examined and testified as follows:

CROSS-EXAMINATION

BY MR. PERRIN:

Q    Ms. Cody, good morning. Good afternoon. How are you?

A    Fine. How are you?

Q    Do you understand you're still you oath?

A    Yes.

Q    When we stopped yesterday, I was asking you about what political activity you did for John Ensley. And so I'll ask that question again so we'll know we left off.

So what political activity did you do for Mr. Ensley?

A    I attended some meetings that were

Electronically signed by Elizabeth Hollingsworth (601-048-705-3908)                    1ecbfd2b-cb0d-41ae-89fe-20c388575a96

held about once a week to discuss many things.  I had a magnetic sign that had his name, John Ensley's name, and Hester Sitton's name on it.

Q    And what was Ms. Sitton running for?

A    Clerk of court.

Q    And who was she running against?

A    Sue King.

Q    That's Kevin King's mom?

A    Yes.

Q    Did Kevin ever say anything to you about you supporting Ms. Sitton?

A    No.

Q    And these meetings, were they organized by John Ensley's campaign or were they organized by someone else?

A    Someone else organized them.

Q    What was the nature of the meetings?

A    Sometimes discussing on future plans what he would like to do, informative from him.

Q    "He" being John Ensley?

A    Yes.  Sorry.

Q    That's okay.

A    Some of them would discuss, you know, things that they wanted to do to raise money for his campaign.

Electronically signed by Elizabeth Hollingsworth (601-048-705-3908)          1ecbfd2b-cb0d-41ae-89fe-20c388575a96

Q    Right.  In the beginning -- in the end, he ran against Curtis Cochran, right --

A    Right.

Q    -- in the general election in November?

A    Yes.  He would have had to have been in the primary.

Q    Okay.  And would you have helped him out prior to his primary race?

A    I don't know.  I don't remember.

Q    All right.  Do you remember if he did run in the primary?

A    I would say that he did if there were other Democratic candidates running, but I can't be completely sure about that because I came in later, I would say.

Q    Would it be fair to say there probably -- well, strike that.

Would it be fair to say that Swain County is a very political county?

A    Very political, I would say.

Q    Would it also be fair to say there's probably -- in every election, be it primary or general, it's contested versus unopposed?

A    Explain contested versus unopposed.

Q       Sure.  Would it fair to say it's rare in Swain County to have, for instance, a -- for example, a sheriff's race where the incumbent sheriff is just running by himself, in other words, against nobody?

A       That would be rare, yes.

Q       And generally in Swain County, there are folks applying to become part of the political process, be it commissioners, be it sheriff, be it clerk of court; right?

A       There are lots of people running for the offices, yes.

Q       And other than, Ms. Cody, having the magnetic sign on the back of your truck -- you said?

A       Yes.

Q       -- and the meetings, of course, what else did you do for Mr. Ensley besides those two things?

A       Does election day count?  Do you want to know what I did that day?

Q       Yes, ma'am.

A       Election day, I had two signs on the back of my truck.  I believe two.  And I stood there with my two signs on the back of my truck.

Electronically signed by Elizabeth Hollingsworth (601-048-705-3908)                    1ecbfd2b-cb0d-41ae-89fe-20c388575a96

that to you, but if we haven't, we can get it.

MR. PERRIN: Thank you.

Q        Why did you take that picture? Just any particular reason?

A        You know, for my -- for the suit. I wanted to show what I had so nobody would question it.

Q        So when did you take the picture?

A        During the suit. Sometime in the beginning of it.

Q        Okay. And it wasn't during -- you didn't take a picture on election day; right?

A        No.

Q        What was your purpose of holding the signs on election day? I mean, was it at a precinct?

A        I was at the Allman precinct.

Q        Where is that located, Ms. Cody?

A        It's west in the county. It's on the west side of the county. It's behind -- Southwestern Community College has like a satellite site or just a site that they use. It's an old school --

Q        Okay. Is that --

A        -- on the west side of the county, and

it's behind it. Well, it's at the back side of the building. The back half of it is used for that.

Q   Okay. So the Allman precinct, just to clarify, part of it is used by Southwest Community College?

A   Yes.

Q   Okay. And do you know if Southwest Community College gets funds from the County?

A   Yes.

Q   Would that be considered -- the Allman precinct, is that county property?

A   Probably so. I think the school uses it, and it would be county property. I'm not for sure though.

Q   Okay. And how long did you stay out there on election day, ma'am?

A   Couple hours.

Q   Did you yell at anybody? I mean, not yell in a bad way, but yell your support for Mr. Ensley or Ms. Sitton to anybody or answer questions from anybody while you were sitting out there?

A   No.

Q   Just held your signs and --

When you say "sticker," you're talking about a magnetic sign?

MR. PERRIN:  Yes.

A    Yes.

Q    And, I'm sorry.  You understood I meant --

A    Yes, magnetic sign.

Q    Thank you.  The magnetic sign.

Let me ask you this.  Why did you campaign for Mr. Ensley over Sheriff Cochran?

A    Many reasons.  I knew Johnny Ensley. I had actually attended church with him in the past.  I thought he would make a good sheriff. He had good ideas.

Q    What ideas --

A    He --

Q    I'm sorry.  I didn't mean to interrupt you.

A    He was also, you know, the one running on the Democratic ticket.

Q    Are you a Democrat?

A    Yes.

Q    Did you vote for Curtis Cochran in 2006 when he ran?

A    Am I allowed to tell you that?

Electronically signed by Elizabeth Hollingsworth (601-048-705-3908)            1ecbfd2b-cb0d-41ae-89fe-20c388575a96

you that you were terminated because of your campaigning?

A     Most of them didn't go into detail. They just said they heard it.

Q     They heard it from somebody in the community?

A     (Nods head affirmatively.)

Q     After the election, there was, and I think the record would show, there was an organizational meeting on December 6th, 2010, where the commissioner -- the new commissioners were -- they had their first meeting. But before that, they were sworn in. Okay. Do you remember hearing that testimony?

A     Yes.

Q     Okay. Did you attend not the organizational meeting but the swearing in of the new commissioners?

A     Yes.

Q     Okay. And how long did that process take, the swearing in take?

A     Maybe almost an hour.

Q     Okay. And after that was the organizational meeting?

A     Yes.

Q    And that's where you expected to be reappointed as finance officer?

A    Yes.  Well, not true.

Q    Okay.

A    Let me explain that briefly.

Q    Sure.

A    I didn't know about the reappointments.  I was actually very ignorant to that fact.  I was actually explained -- Cindi Woodard explained it to me that you got reappointed.  So I kind of wasn't for sure.  This was the first meeting like that I had ever been to.

Q    Now, did Cindi explain that to you before December 6th or after December 6th?

A    It was that morning right before the meeting.

Q    Okay.  So Cindi would say, hey, by the way, everyone needs to be reappointed who's appointed by the board?

A    It was a reappointment meeting. That's what's going on.  It was just a brief conversation on the way.  And, of course, I didn't know what the -- really occurred.

Q    And so you attended the organizational

meeting?

A    Yes.

Q    And what was your -- I mean, you were not reappointed, correct, as finance officer?

A    No, I was not.

Q    What was your thought when your name was not mentioned as -- nominated, I should say, appointed as finance officer?

A    Utter shock.

Q    Okay.  Tell me what went through your mind.  I mean, I know utter shock.  But if you can describe what that means.

A    I kept wondering what had just happened.  Did I just lose my job?

Q    And what -- did you do anything?  Did you talk to anybody?

A    I got up.  Well, when it first happened, I stood up, walked to the door, walked out the door a little ways because I was pretty much hyperventilating, came back in, stood there a second, sat down.

I mean, there was just -- I was kind of having a moment and not to disturb the meeting.  And it was coming to the end of meeting.  I left, went down to my office.  The

A       Yes.

Q       And when Kevin gave that to you, did you read it?

A       Yes.  That's why I questioned what it had to do with me.

Q       And you actually asked that or you thought that?

A       I asked that --

Q       And what was his --

A       -- what did it have to do with me.

Q       I'm sorry.  What did Kevin say?

A       I don't remember exactly what he said right that very second.  There was some moving around.  He went -- he was standing in the doorway of his office.  Elise went to her office and sat down.  And I was standing there, and my son was there.

        And we got in the conversation about, you know, why I was let go.  And I said -- I asked him, I said, so you're telling me --

        He did bring up about talking to David Monteith.  He said David Monteith had talked to him and had Kim Lay to look up that information, something along that line.  And --

Q       Was the reference to David Monteith

Electronically signed by Elizabeth Hollingsworth (601-048-705-3908)                1ecbfd2b-cb0d-41ae-89fe-20c388575a96

regarding why Kim Lay had drafted that letter that I just showed you?

A       That was -- yeah, I assume that's what Kevin was telling me.

Q       Not that David Monteith saw you campaigning?

A       I don't remember him mentioning -- he might have mentioned that David saw me.

Q       All right.

A       It's hard to remember exact without looking over my testimony or my cheats.  He might have said that David saw me campaigning at the site and that David had had him to contact Kim Lay and ask her if it was okay or if she could just do the research.  I don't know.

Q       Sure.

A       And I asked him if -- I said, so I lost my job because I was supporting a political candidate?

Q       And what did Kevin say?

A       He said, yes.  He said, you cannot support a candidate.  You can't support someone.

        And I said, so -- that it was Johnny Ensley, me supporting Johnny Ensley was the reason I was let go?

reiterating, you know, that it's public information.

Q     Okay.  Would it be fair to say that half of the eight bullet points in this letter, Exhibit No. 6, were related to your dealings with Sheriff Cochran?

A     To the drug dog incident.

Q     So is that fair to say?

A     To the drug dog incident.

Q     Okay.  What is -- what is the Partnership for the Future?  Is that a nonprofit here in Swain?

A     If it still exists.

Q     Did it exist when you were finance officer?

A     Yes.

Q     All right.  And what, to your knowledge, did it do?

A     I have no idea.

Q     All right.  Did the County provide money to Partnership for the Future, to your knowledge?

A     We could have.  I'm not for sure.  I don't -- it's hard to remember small things like that.

Q        Okay.  What was the annual budget, do you recall, of Swain County during the years that you were finance officer?

A        10, 11 --

Q        Million?

A        -- million.

Q        And would the sheriff's office be the -- I know there's many departments.  Would the sheriff's office be the highest budget-wise on those departments?

A        I would have to look at it and compare and see.  I never did that.

Q        All right.  Would it be -- would it surprise you if it was?

A        Considering the sheriff and the jail usually together, it wouldn't surprise me.  But I don't know.

Q        And I know DSS is probably pretty high too; right?

A        I would imagine DSS, the health department, sanitation even.  So I don't know.

Q        What was the budget for the finance office, do you recall, during the time you were finance officer?

A        I have no idea.

audit report.

Q    And it looks like towards the bottom of that same page Bowman also said that there was misuse of county credit card for several personal type items.  Do you see that right above "Cut costs, don't raise taxes"?

A    "Bowman also alerted"?

Q    Yes, ma'am.  Do you see that?

A    Yes.

Q    So you remember Bowman telling you that, that there was a problem with the sheriff's office with someone purchasing personal items?

A    Bowman was informed of that.

Q    By?

A    Kevin had me call him when that occurred also to find out what to do.

Q    All right.  Third page, Ms. Cody.

A    Uh-huh (affirmative).

Q    It's the eight paragraph, said, "Vida Cody."  Starts with your name.  Do you see that?

A    Yes.

Q    Okay.  And to paraphrase, it says that you're working with Sheriff Cochran to cut expenses?

A    Yes, I see that.

Q    All right.  Is that accurate as of November -- October 14th, '09?

A    In the aspect that I would help the sheriff's department, not him because --

Q    Right.  I --

A    -- he didn't speak to me --

Q    Right.

A    -- find vendors with good prices and stuff like that.

Q    So to be fair, you were not assisting Curtis Cochran, but you were assisting the Swain County Sheriff's Office in cutting expenses by getting better vendors?

A    Assist -- yeah, assisting them in finding better vendors with cheaper prices so that they could save money.

Q    Okay.  Second sentence there, same paragraph, says, "According to Cody, Cochran has someone else handle meal purchases for the jail."

Is that something you helped Sheriff Cochran develop, or is that something he developed on his own?

A    He and Kevin would have developed that.

Q    And you see the third paragraph after

Q       Is that true?

A       That was what I was told to say, yes.

Q       You were told to say this by who?

A       Kevin King.

Q       So when Ms. Shrestha, S-h-r-e-s-t-h-a, called you, Kevin told you what to tell her?

A       Yes.

Q       Next and last article, it looks like it's an April 21st, 2010, article.  And, ma'am, if you could look with me on page four, four of seven, do you see it says "Republican ... candidate Wayne Dover"?  That one?

                MR. BUCKLEY:   "Republican sheriff candidate Wayne Dover"?

                MR. PERRIN:   Yes.

Q       If you could read that paragraph just to yourself.

A       (Witness complies with request of counsel.)

Q       Is that -- did Mr. Dover request records for D.A.R.E. funds from you?

A       Mr. Dover brought in a letter to Kevin King.  Kevin King brought it into my office and asked me to research it, get the information that I could from it.  And he actually, Kevin, wound

up doing most of the talking because Curtis wouldn't talk to me.

So -- and then, however, it was found out that -- the word was sent down that they would not provide that information.

Q    The sheriff's office?

A    Yes.

MR. PERRIN:  May we go off the record for a moment?

MR. BUCKLEY:  Yeah.

THE VIDEOGRAPHER:  Hang on one second, please.  Okay.  We're off.

(Deposition in recess, 1:23 p.m. to 1:32 p.m.)

THE VIDEOGRAPHER:  We're back on the record.

Q    Ms. Cody, you understand you're still under oath?

A    Yes.

Q    When you said you took the flash drive home.  It had some forms, I guess, on it.  Did Kevin King tell you to take that flash drive home?

A    The flash drive was at home before that day, and, yes, Mr. King had allowed me to

# Swain County Purchasing Policy

Purchase requests must be submitted to the Finance Office by the Department Head.

For all purchases of $100 or more, a purchase order is required for all County departments. Monies shall not be expended on any purchase for which there is no budget appropriation. NC G.S. 159-28 (Local Government Finance, Article 3: The Local Government Budget and Fiscal Control Act)

Contracts for construction/renovation/repair projects and purchases of equipment, supplies, or material items will be purchased in accordance with NC G.S. 143-128 through 143-135 (State Departments, Institutions, and Commissions, Article 8: Public Contracts)

All tangible items with values in excess of $2,500 will be compiled on the County Fixed Asset List.

_____
County Manager

_____8/30/10_____
Date

_____
County Finance Officer

_____8-25-10_____
Date



DEFENDANT'S EXHIBIT

VC000028

# Memorandum

**Date:**       November 4, 2008

**To:**        Swain County Department Heads and Staff

**From:**      Vida Cody, Finance Officer   VC

**Subject:**    Purchase Orders

---

At the conclusion of the 07/08 Audit, the following decision was made in regards to completion of purchase orders for purchases of $100 or more.

> The Finance Officer will not distribute funds until a proper purchase order is obtained.

> Department Heads failing to acquire a purchase order for purchases of $100 or more, will have to appear before the county commissioners for approval of the outstanding invoice. The outstanding invoice will not be paid until it has been approved.

It is the responsibility of the Department Head to insure that purchase requisitions/quotes for completion of purchase orders, are submitted to the finance officer in a timely manner. Once the purchase order has been approved, then and only then can the purchase be made and paid for.

vc

SC- 302

From: Vida Cody
Sent: Tuesday, July 27, 2010 11:39 AM
To: Chandler Francis
Subject: RE: Transfer to Long Term/ North Shore Funds

Sorry for the delay, I was out of the office for a few days. I would like to confirm the earlier request to move the $8.8 million from the STIF to the LTIF.

Thank you,
Vida Cody

---

From: Chandler Francis [chandler.francis@nctreasurer.com]
Sent: Monday, July 26, 2010 3:14 PM
To: Chandler Francis; Vida Cody; Kevin S. King
Cc: Sharon Morgan; Amy Bowman
Subject: RE: Transfer to Long Term/ North Shore Funds

Kevin and Vida:

I have just left a voice mail for Vida as follow up, but I have not heard confirmation from either of you on the requested move of $8.8 million from the STIF to the LTIF for August 1.

Please respond by email as soon as possible whether you would like to move ahead with this funds transfer or not.

Thanks

*Chandler Park Francis*
State Banking Operations Manager
325 N. Salisbury Street
Raleigh, NC 27603
919-508-5952 (phone)
919-508-5924 (fax)
chandler.francis@nctreasurer.com
www.nctreasurer.com

E-mail correspondence to and from this address may be subject to the North Carolina Public Records Law. It may be subject to monitoring and disclosed to third parties, including law enforcement personnel, by an authorized state official.
IMPORTANT: When sending confidential or sensitive information, encryption should be used.

---

From: Chandler Francis
Sent: Tuesday, July 20, 2010 1:58 PM
To: 'Vida Cody'; 'Kevin S. King'
Cc: Sharon Morgan; Amy Bowman
Subject: Transfer to Long Term/ North Shore Funds

Vida and Kevin,

We are planning on moving, per our previous discussions, $8.8 million from the Swain County STIF account (your North Shore federal settlement money) to the LTIF (long term account) on August 1, 2010.

Could you please confirm this request, by email (reply all, please), on or before 12:00 noon on Monday, July 26, 2010?

1

SC- 341

I had to fill out some authorization sheets for NCCMT and have the clerk to the board of commissioners sign the. Have sent it in and now just waiting on RBC to be added. Be patient. I am working just as fast as I can on this and I am the only one who can move the money. NCCMT does not allow any trsfrs. after 12pm and that makes this process take longer.
Thanks,
Vida

SC- 342

# Memorandum

**Date:**       April 20, 2010

**To:**        Swain County Department Heads and Staff

**From:**      Vida Cody, Finance Officer

**Subject:**    Final Purchases for Fiscal Year End

---

Just a reminder that all purchase orders need to be turned in, to the finance office, by May 14th.

After May 14th no purchase orders will be issued and after May 21st no purchases will be allowed, except those of absolute necessity.

SC- 351



# Memorandum

**Date:**     August 28, 2009

**To:**       Swain County Department Heads and Staff

**From:**     Kevin King, County Manager
              Vida Cody, Finance Officer

**Subject:**  Department Purchases

---

Due to economic hardship all departments are requested to continue to hold off on all purchases, that are not <u>absolutely necessary</u> for departmental operation.

Purchase orders will not be issued at this time, unless the County Finance Officer determines it absolutely necessary.

No travel will be allowed unless it is required as part of your job description and funds are available. If classes or meetings can be rescheduled for a later date, please do so.

Office supply orders will be done on a quarterly basis by the County Finance Officer. All purchase requisitions will need to be submitted to the Finance Officer by October 15th.

vc

# Memorandum

**Date:**      November 4, 2008

**To:**        Swain County Department Heads and Staff

**From:**      Vida Cody, Finance Officer   *VC*

**Subject:**   Purchase Orders

---

At the conclusion of the 07/08 Audit, the following decision was made in regards to completion of purchase orders for purchases of $100 or more.

> The Finance Officer will not distribute funds until a proper purchase order is obtained.

> Department Heads failing to acquire a purchase order for purchases of $100 or more, will have to appear before the county commissioners for approval of the outstanding invoice. <u>The outstanding invoice will not be paid until it has been approved.</u>

It is the responsibility of the Department Head to insure that purchase requisitions/quotes for completion of purchase orders, are submitted to the finance officer in a timely manner. Once the purchase order has been approved, then and only then can the purchase be made and paid for.

vc

SC- 364



DEFENDANT'S EXHIBIT

SWAIN COUNTY, NORTH CAROLINA
SCHEDULE OF FINDINGS AND QUESTIONED COSTS
FOR THE YEAR ENDED JUNE 30, 2008

Section II.     Findings Related to the Audit of the General Purpose
                Financial Statements of Swain County:

2008-1     Internal Controls Over Financial Reporting

Condition:           The County does not incorporate an
                     internal audit function (person).

Criteria:            Due to the complexity and diverse type
                     of financial transactions an internal
                     audit function is needed.

Effect:              Internal controls are less effective
                     without an internal audit function.

Cause:               Due to the size of the County it has
                     not been considered cost effective.

Recommendation:      Hire an additional employee familiar
                     with governmental accounting
                     transactions to provide this service.

Management Response: It is not economically feasible to
                     hire additional staff at this time.


2008-2     Internal Controls Over Financial Reporting

Condition:           The sheriff's department is not always
                     using purchase orders before making
                     acquisitions.

Criteria:            Purchase orders are to be used for all
                     purchases in excess of $100.

Effect:              Without the use of purchase orders
                     controls over departmental
                     expenditures are weakened.

Cause:               The County has not properly
                     stressed the importance of the use
                     of purchase orders.

Recommendation:      We recommend the finance officer
                     not distribute funds until a proper
                     purchase order is obtained.

Management Response: The County agrees with this finding.

SC- 264

Findings Related to the Audit of the General Purpose
Financial Statements of Swain County:  Continued:

2010-3     Internal Controls Over Financial Reporting

    Condition:                The Sheriff's department generated
                                  funds from fund raising events which
                                  were not controlled by the Finance
                                  Officer.

    Criteria:                 All funds generated by County
                                    departments are to be turned over to
                                    the Finance Officer for deposit.

    Effect:                   It is possible for cash to be
                                    misappropriated.

    Cause:                    The County has not implemented
                                    proper training to department heads.

    Recommendation:       We recommend all revenue to be
                                  under the control of the finance
                                officer and properly deposited into
                                County accounts.

Management Response: The County agrees with this finding.


2010-4     Internal Controls Over Financial Reporting

    Condition:                There is not proper segregation of
                                    duties over cash collected in the
                                    Recreation department.

    Criteria:                 Management is responsible for
                                    implementating proper internal
                                  controls over cash collections.

    Effect:                   Misappropriation of funds, if any,
                                    can not be detected.

    Cause:                    The County does not have adequate
                                    staffing in the recreation department
                                    to properly segregate duties.

    Recommendation:       We recommend additional staffing
                                  and/or the use of training volunteers
                                  to properly handle and account for
                                Recreation department receipts.

Management Response: The County agrees with this finding.

SWAIN COUNTY, NORTH CAROLINA

CORRECTIVE ACTION PLAN

FOR THE YEAR ENDED JUNE 30, 2010


Finding:    2010-1

    A.    Name of Contact Person:    Vida Cody, Finance Officer

    B.    Corrective Action:    It is not economically feasible to hire additional staff at this time.

    C.    Proposed Completion
       Date:    N/A


Finding:    2010-2

    A.    Name of Contact Person:    Vida Cody, Finance Officer

    B.    Corrective Action:    Budget amendments will be approved by the Board before expenditures are made out of departments which have exceeded the original budget.

    C.    Proposed Completion
       Date:    The Board will implement the above procedure immediately.


Finding:    2010-3

    A.    Name of Contact Person:    Vida Cody, Finance Officer

    B.    Corrective Action    All fund raising activities will be controlled by the Finance Director.

    C.    Proposed Completion
       Date:    The Board will implement the above procedure immediately.

Finding:     2010-4

    A.    Name of Contact Person:    Vida Cody, Finance Officer

    B.    Corrective Action:    Additional staffing will be provided for recreation cash collections.

    C.    Proposed Completion Date:    The Board will implement the above procedure immediately.


Finding:     2010-5

    A.    Name of Contact Person:    Vida Cody, Finance Officer

    B.    Corrective Action:    The County does not have adequately trained staff to correct this finding at this time.

    C.    Proposed Completion Date:    N/A

## SWAIN COUNTY, NORTH CAROLINA

## SUMMARY SCHEDULE OF PRIOR YEAR AUDIT FINDINGS

1) There was one audit finding relative to internal controls concerning hiring an internal auditor. We feel it is not economically feasible to hire additional staff at this time.

2) There was one audit finding concerning not using purchase orders in all cases. This finding was corrected.

3) There was one audit finding relative to misuse of credit cards. This finding was corrected.

4) There was one audit finding for the year ended June 30, 2009 concerning certain departments being over expended. Budget amendments were made throughout the year. However, several departments were again over expended due to auditor reclassifications, booking of certain unforeseen accounts payable, and oversight concerning interfund transfers.

5) There was one finding concerning not making deposits timely. This finding was corrected.

6) There was one finding relative to not verifying real property ownership in the Medicaid program. This finding was corrected.

All other findings have been corrected.